UNITED STATES OF AMERICA,

Plaintiff,

v.                                            Case No. 17-160

RONALD H. VAN DEN HEUVEL,

Defendant.

## PLEA AGREEMENT

1.      The United States of America, by its attorneys, Matthew D. Krueger, United States Attorney for the Eastern District of Wisconsin, Adam H. Ptashkin, Assistant United States Attorney, and BeLinda I. Mathie, Special Assistant United States Attorney, and the defendant, Ronald H. Van Den Heuvel, individually and by attorney Robert G. LeBell, pursuant to Rule 11 of the Federal Rules of Criminal Procedure, enter into the following plea agreement:

## CHARGES

2.      The defendant has been charged in a 14-count indictment, which alleges ten violations of Title 18, United States Code, Sections 1343, 1349 and 2, and four violations of Title 18, United States Code, Sections 1957 and 2.

3.      The defendant has read and fully understands the charges contained in the indictment. He fully understands the nature and elements of the crimes with which he has been charged, and those charges and the terms and conditions of the plea agreement have been fully explained to him by his attorney.

4.      The defendant voluntarily agrees to plead guilty to the following count (Count One) set forth in full as follows:

**THE GRAND JURY CHARGES:**

1. Beginning at least by March 8, 2011, and continuing at least through August 2015 in the State and Eastern District of Wisconsin and elsewhere,

## RONALD H. VAN DEN HEUVEL

knowingly devised and participated in a scheme to defraud lenders and investors, and to obtain money from lenders and investors by means of materially false and fraudulent pretenses, representations, and promises related to his "Green Box" business plan, which scheme is more fully described below.

2. As a result of his scheme, Van Den Heuvel fraudulently obtained more than $9,000,000 from a range of lenders and investors, including individual acquaintances, the Wisconsin Economic Development Corporation ("WEDC"), a Canadian institutional investor, and Chinese investors who participated in the EB-5 immigrant investor program.

### Background

3. At all times material to this indictment:

a. Defendant Ronald H. Van Den Heuvel purported to be a businessman in De Pere, Wisconsin. Earlier in his career, Van Den Heuvel had some success in the recycling and paper-making industry. By the end of 2010, however, Van Den Heuvel did not own or control any facilities that generated any significant revenue. Around then, Van Den Heuvel began promoting his "Green Box" business plan to obtain funds in the scheme.

b. As represented by Van Den Heuvel, the Green Box business plan was to purchase the equipment and facilities necessary to employ proprietary processes that could convert solid waste into consumer products and energy, without any wastewater discharge or landfilling of byproducts.

2

c.    As part of his scheme, Van Den Heuvel formed and controlled numerous business entities, including the ones identified below, that he used interchangeably for business and personal purposes.

d.    Environmental Advanced Reclamation Technology HQ, LLC ("EARTH") was the operating name of Everett Advanced Reclamation Technology HQ, LLC, which Van Den Heuvel formed as a Wisconsin limited liability corporation. Van Den Heuvel represented EARTH as the holding company for his other entities.

e.    Green Box NA, LLC ("Green Box NA") is a Wisconsin limited liability corporation that Van Den Heuvel formed and controlled.

f.    Green Box NA Green Bay, LLC ("Green Box-Green Bay") was a Wisconsin limited liability corporation that Van Den Heuvel formed and represented as pursuing the Green Box business plan in De Pere, Wisconsin.

g.    Green Box NA Detroit, LLC ("Green Box-Detroit") was a Michigan limited liability corporation that Van Den Heuvel formed and represented as pursuing a Green Box operation in Detroit, Michigan, that would sort waste and create fuel products.

### The Scheme

Van Den Heuvel's scheme was essentially as follows:

4.    Beginning by at least March 8, 2011, and continuing through at least August 2015, Van Den Heuvel obtained funds from lenders and investors under materially false pretenses, representations, and promises, including the following:

a.    Van Den Heuvel represented and promised that he would use, and had used, the lenders' and investors' funds to advance the Green Box operations. In many

3

instances, Van Den Heuvel entered into agreements with lenders and investors that dictated specific uses for the funds, such as the purchase of particular equipment.

      b.      Van Den Heuvel produced false financial statements that grossly inflated his personal wealth and his companies' assets, including its intellectual property.

      c.      Van Den Heuvel promised potential investors or lenders that their funding would allow him to acquire critical equipment and begin full-time Green Box operations quickly.

      d.      Van Den Heuvel falsely claimed to have entered into agreements with major companies when, in truth, Van Den Heuvel never had such agreements or they had been terminated.

      e.      Van Den Heuvel falsely represented that particular business entities had title and control of property where Green Box operations would occur when, in fact, those entities lacked title and control of the property.

      f.      Van Den Heuvel provided security interests in the same equipment to multiple investors and lenders, misleading them about the existence and value of their security interests.

5.      Soon after receiving funds from lenders or investors, Van Den Heuvel diverted significant portions of the funds to purposes that did not advance the Green Box business plan, let alone the specific uses dictated in funding agreements. In the course of diverting the funding, and to conceal the diversion:

      a.      Van Den Heuvel opened numerous bank accounts at different financial institutions and in different business entities' names.

      b.      Van Den Heuvel made multiple transfers of the funds between the bank accounts.

c.    Van Den Heuvel converted large amounts of investors' and lenders' funds to cash.

d.    Van Den Heuvel used significant amounts of the lenders and investors' funds to pay personal expenses, creditors, and legal obligations that were unrelated to the Green Box business plan.

e.    Van Den Heuvel also used substantial amounts of the lenders' and investors' funds to further promote the scheme. For example, Van Den Heuvel paid employees and consultants to prepare Green Box promotional materials, valuations, and financial statements that were based upon misleading assumptions Van Den Heuvel provided. Van Den Heuvel used those materials to obtain additional loans and investments.

6.    As part of the scheme, Van Den Heuvel took steps to conceal how he had misused lenders' and investors' funds, lull lenders and investors into a false sense of security, and deter them from taking action to recoup their funds. Such steps included the following:

a.    Van Den Heuvel claimed that new investments of tens and hundreds of millions of dollars were imminent, and that he would use those new investments to pay earlier lenders and investors.

b.    Van Den Heuvel falsely represented to lenders and investors that their funds had been used for the intended purposes.

c.    When lenders or investors questioned why the Green Box operations were not proceeding, Van Den Heuvel provided false excuses and did not reveal that he had diverted much of the funding.

### Investor M.A.

7.    As part of his scheme, Van Den Heuvel defrauded investor M.A.:

a.　　　In early 2011, Van Den Heuvel made false representations to induce M.A., an acquaintance in the Green Bay area, to invest $600,000 in Green Box-Green Bay. Van Den Heuvel assured M.A. that he would use the funds to pursue the Green Box-Green Bay business plan.

b.　　　Relying on Van Den Heuvel's assurances, M.A. executed an Agreement to Issue Stock and Provide Collateral (the "Agreement") on or about April 4, 2011. M.A. sent the $600,000 to Green Box-Green Bay by wire transfer on or about the same day. Under the Agreement, M.A. received 600,000 "membership units" in Green Box-Green Bay, a guaranteed annual return of 10% to be paid in quarterly installments, and certain security interests.

c.　　　Van Den Heuvel quickly spent the majority of M.A.'s investment on purposes unrelated to Green Box-Green Bay, including paying over $19,000 for Packers tickets in club seats and over $57,000 in court-ordered support to his ex-wife.

d.　　　Van Den Heuvel failed to pay M.A. quarterly interest payments required by the Agreement. Throughout 2011 and 2012, Van Den Heuvel assured M.A. that significant funding for Green Box-Green Bay was imminent and that M.A. would receive payments.

e.　　　To deter M.A. from filing a civil lawsuit, Van Den Heuvel agreed to refund M.A.'s investment as soon as Green Box-Green Bay received significant funding that Van Den Heuvel promised was imminent. On September 25, 2012, Van Den Heuvel emailed M.A. to say he "should have the $600,000 within 10 days," and forwarded an email from what appeared to be a potential investor. On October 31, 2012, Van Den Heuvel emailed M.A. again, saying that a "hurricane hitting the East Coast and specifically New York

6

has slowed the process." Van Den Heuvel's emails delayed M.A. from filing suit by holding out the potential of repayment.

<em>WEDC</em>

8.     As part of his scheme, Van Den Heuvel defrauded the WEDC:

a.     On or about March 8, 2011, Van Den Heuvel submitted a proposal to the Wisconsin Department of Commerce, the predecessor to the WEDC, seeking funding. The proposal and subsequent submissions included false representations and inflated financial statements that portrayed Van Den Heuvel and his business entities as creditworthy. Van Den Heuvel represented that WEDC's funding would allow the company to start full-time operations and create 116 new jobs at the EcoFibre facility at 500 Fortune Ave., De Pere, Wisconsin.

b.     On or about September 14, 2011, Van Den Heuvel executed a loan agreement with the WEDC to obtain a loan of $1,116,000. The loan agreement provided that Green Box-Green Bay would use the WEDC funds to purchase and install equipment that would produce marketable pulp, fuel pellets, synthetic fuel, and tissue and cup products. The loan agreement further stated that, prior to the disbursement of any funds, Green Box-Green Bay had to deliver to the WEDC: (i) documentation that Green Box-Green Bay had acquired the EcoFibre facility; (ii) a mortgage on the EcoFibre facility; (iii) documentation that Green Box-Green Bay would purchase all the equipment necessary to produce marketable pulp, baled and sorted waste paper, fuel pellets, and synthetic fuel; and (iv) documentation that VHC, Inc. (a company controlled by Van Den Heuvel's brothers) had contributed $5,500,000 of equity to the project.

c.     On or about September 30, 2011, Van Den Heuvel submitted a request to the WEDC for the full loan of $1,116,000. In the draw request, Van Den Heuvel

7

submitted documentation that gave the false impression that VHC, Inc. had contributed $5.5 million to assist Green Box-Green Bay in acquiring the EcoFibre facility. The documentation included a mortgage that Van Den Heuvel executed in the name of Green Box-Green Bay in favor of the WEDC. In truth, VHC, Inc. contributed funds to refinance a mortgage on the EcoFibre facility for its own benefit, not for the benefit of Green Box-Green Bay. Green Box-Green Bay never acquired the EcoFibre facility, and the mortgage that Van Den Heuvel gave the WEDC was worthless.

     d.     In the draw request, Van Den Heuvel represented that he planned to expend the funds to purchase specific pulping, sorting, liquefaction, shredding, and pellet-making equipment from particular vendors.

     e.     Based upon those representations, the WEDC disbursed the $1,116,000 to Green Box-Green Bay on or about October 21, 2011.

     f.     Although Van Den Heuvel used WEDC funds to make some partial payments for equipment identified in the draw request, Van Den Heuvel diverted most of the funds to purposes not permitted by the loan agreement.

     g.     Thereafter, Van Den Heuvel concealed his misuse of WEDC funds in communications with the WEDC. For example, on or about March 31, 2014 and April 14, 2015, Van Den Heuvel submitted Schedules of Expenditures to the WEDC in which he falsely certified that Green Box-Green Bay had expended all loan funds in accordance with the loan agreement's terms.

     h.     On or about January 4, 2012, the WEDC also awarded Green Box-Green Bay a grant of up to $95,500 to reimburse the costs of training employees in waste sorting, fuel pellet production, and liquefaction manufacturing.

i.     To draw the grant funds, on or about December 9, 2013, March 5, 2014, and November 20, 2014, Van Den Heuvel submitted requests for payment to the WEDC. The requests included fraudulent records that represented particular individuals had received training during particular periods. As Van Den Heuvel knew, that training never occurred. These false records caused the WEDC to disburse the full grant amount of $95,500.

## Investor D.W.

9.     As part of his scheme, in September 2012 and December 2012, Van Den Heuvel induced D.W. to invest a total of $40,000 in Green Box-Green Bay in exchange for 200,000 "membership units" in Green Box-Green Bay and a promise of repayment. Van Den Heuvel falsely represented to D.W. that he would use much of the funds for patent and legal fees. Van Den Heuvel converted D.W.'s investment to cash and never repaid him.

## Cliffton Equities

10.    As part of his scheme, Van Den Heuvel defrauded Cliffton Equities:

a.     Van Den Heuvel made material false representations to Cliffton Equities, a private investment firm located in Montreal, Canada, that caused it to invest funds in Green Box-Green Bay.

b.     On or about September 21, 2012, Cliffton Equities entered into a Loan and Investment Agreement (the "Agreement") with Green Box-Green Bay and EARTH to provide $2 million in funds. According to the Agreement, as well as oral assurances Van Den Heuvel gave to Cliffton Equities, Green Box-Green Bay would use the funds "solely for the purposes of purchasing and installing the sorting and liquefaction Equipment . . . at Green Box's facility" and for "working capital to operate sorting, liquefaction and pulping equipment." Van Den Heuvel further represented to Cliffton Equities that its

funds would be used to purchase a liquefaction unit from RGEN Systems, and that the unit would be suitable for the Green Box-Green Bay business plan.

c.       Relying on Van Den Heuvel's and the Agreement's representations, Cliffton Equities wired $1 million to EARTH on or about September 21, 2012. Cliffton Equities wired an additional $1 million to EARTH on or about September 28, 2012.

d.       After receiving Cliffton Equities' funds, Van Den Heuvel paid RGEN Systems only part of the price for the liquefaction unit, which was never completed.

e.       Van Den Heuvel instead diverted much of Cliffton Equities' funds to purposes not permitted by the Agreement. For example, Van Den Heuvel used the funds to pay $25,000 to an acquaintance as reimbursement for Green Bay Packers tickets; $33,000 for his spouse's dental work; $89,000 towards the purchase of a new Cadillac Escalade; and $16,570 to the Wisconsin International School where his children attended.

f.       Van Den Heuvel concealed his misuse of Cliffton Equities' funds by falsely representing to Cliffton Equities that its funds were being used to purchase and install the needed equipment.

g.       Sometime in 2013, Van Den Heuvel falsely represented to Cliffton Equities that the RGEN liquefaction equipment could not be completed because of design problems. Van Den Heuvel persuaded Cliffton Equities to provide additional funds to purchase two pyrolysis units from a different manufacturer, Kool Manufacturing Company.

h.       On June 19, 2014, Cliffton Equities entered into an Amended Loan and Investment Agreement with Green Box-Green Bay and EARTH. This Agreement provided that Cliffton Equities would provide additional funds solely for the purposes of

10

"purchasing and installing" the two Kool Units and for "restarting the EcoFibre, Inc. facility and providing working capital funds for such facility's operation."

  i.  Van Den Heuvel thereafter requested payments from Cliffton Equities, representing that the payments were needed to purchase and install the two Kool Units. Based upon Van Den Heuvel's representations, Cliffton Equities sent to Green Box-Green Bay and Green Box NA the following amounts totaling approximately $1,149,000: (i) $300,000 on or about June 19, 2014; (ii) $99,980 on or about August 29, 2014; (iii) $379,980 on or about November 6, 2014; (iv) $299,980 on or about November 13, 2014; and (v) $70,000 on or about December 2, 2014.

  j.  Van Den Heuvel again diverted large amounts of Cliffton Equities' additional funds to purposes not permitted by the Amended Loan and Investment Agreement, including personal expenditures and business expenses unrelated to purchasing the Kool Units or restarting the EcoFibre facility.

  k.  Van Den Heuvel used only part of Cliffton Equities' funds to make payments for Kool Units. Van Den Heuvel induced other entities to provide funds based upon representations that their funds were also being used to purchase Kool Units without disclosing that he had also pledged to use other entities' funds for Kool Units.

<u>EB-5 Investments</u>

11.  As part of his scheme, Van Den Heuvel defrauded foreign investors who made investments through the EB-5 program as follows:

  a.  The EB-5 program is administered by the United States Citizenship and Immigration Services (USCIS). The program provides a route for immigrant investors to become lawful permanent residents by investing at least $500,000 in a project sponsored

11

by an USCIS-approved regional center. The program requires that the entire $500,000 investment be expended on job-creating activities.

b.  Green Detroit Regional Center, LLC (GDRC) is an USCIS-approved regional center managed and controlled by S.A., an attorney in Georgia. GDRC sponsors individual projects that aim to direct EB-5 investments to environmentally friendly, job-creating entities in the Detroit, Michigan, area.

c.  Van Den Heuvel persuaded GDRC to sponsor a project called SMS Investment Group VI ("SMS 6") to direct EB-5 investments to Green Box-Detroit, which Van Den Heuvel promised would pursue the Green Box business plan in Detroit, Michigan.

d.  On or about December 21, 2012, Van Den Heuvel entered into a Master Loan Agreement on behalf of EARTH and Green Box-Detroit with GDRC and SMS 6. Pursuant to the agreement, GDRC would raise up to $35 million from up to 70 different EB-5 investors and direct the funds to SMS 6. SMS 6 would then lend the EB-5 investment funds to Green Box-Detroit.

e.  Van Den Heuvel represented to GDRC and SMS 6 that he would use the EB-5 investment funds solely to pursue the Green Box-Detroit project. As represented by Van Den Heuvel, the Green Box-Detroit project would purchase and operate a facility and the equipment necessary to sort waste streams, bale recovered paper, and produce gas to operate the facility and synthetic fuel to sell.

f.  Van Den Heuvel made materially false representations regarding the Green Box-Detroit project to SMS 6, knowing that it would be used to promote the project to potential EB-5 investors. These materially false representations included (i) that the funds would be used for the Green Box-Detroit project; (ii) that EARTH and

*Green Box-Detroit had agreements with Cargill, Inc. when, in truth, Cargill, Inc. had*

*terminated the agreements; (iii) that the Michigan Economic Development Corporation*

*(MEDC) had approved Green Box NA Michigan, LLC, an entity Van Den Heuvel had*

*formed, for a tax-exempt bond offering even after MEDC notified Van Den Heuvel that it*

*had discovered multiple liens, tax warrants, judgments, and civil lawsuits against Van*

*Den Heuvel's companies; and (iv) that Green Box-Detroit had acquired certain*

*equipment that it had not acquired.*

      *g.    Based upon Van Den Heuvel's misrepresentations, approximately nine*

*EB-5 investors from China invested approximately $4,475,000 in SMS 6 from September*

*2014 through August 2015. Pursuant to the Master Loan Agreement, SMS 6, in turn,*

*wired those funds to Green Box-Detroit.*

      *h.    Van Den Heuvel diverted large amounts of the EB-5 investments to*

*purposes other than the Green Box-Detroit business plan. Van Den Heuvel never*

*actually acquired the Green Box-Detroit facility nor located any equipment there, let*

*alone began any operations there. To date, none of the EB-5 investors has obtained*

*USCIS approval for their investments.*

*12.    As part of his scheme, Van Den Heuvel similarly induced other individuals and*

*entities to invest and loan funds based upon the false pretense that their funds would be used to*

*advance the Green Box business plan, when in reality, Van Den Heuvel used their funds for*

*other purposes.*

*13.    As a result of his scheme, Van Den Heuvel fraudulently obtained more than $5*

*million from lenders and investors for a Green Box operation in De Pere, Wisconsin. As a*

*further result of his scheme, Van Den Heuvel fraudulently obtained approximately $4,475,000*

*million from EB-5 investors for a Green Box operation in Michigan.*

14.     On or about the date listed below, in the State and Eastern District of Wisconsin,

**RONALD H. VAN DEN HEUVEL,**

*for the purpose of executing and carrying out the above scheme and attempting to do so, caused wire communications and electronic fund transfers to be transmitted in interstate commerce, as follows:*

| *Count* | *Date* | *Description* |
|---------|--------|---------------|
| *1* | *Sept. 21, 2012* | *$1,000,000 wire transfer by Cliffton Equities from Toronto, Canada, through JPMorgan Chase Bank in New York, New York, to U.S. Bank account no. -9590 in Manitowoc, Wisconsin.* |

5.     The defendant acknowledges, understands, and agrees that he is, in fact, guilty of the offense described in paragraph 4. The parties acknowledge and understand that if this case were to proceed to trial, the government would be able to prove the facts in Attachment A beyond a reasonable doubt. The defendant admits that the facts in Attachment A are true and correct and establish his guilt beyond a reasonable doubt. This information is provided for the purpose of setting forth a factual basis for the plea of guilty. It is not a full recitation of the defendant's knowledge of, or participation in, his offense.

## PENALTIES

6.     The parties understand and agree that the offense to which the defendant will enter a plea of guilty carries the following maximum term of imprisonment and fine: 20 years and $250,000. This offense also carries a mandatory special assessment of $100, and a maximum of 3 years of supervised release. The parties further recognize that a restitution order may be entered by the court. The parties' acknowledgments, understandings, and agreements with regard to restitution are set forth in paragraph 29 of this agreement.

7.     The defendant acknowledges, understands, and agrees that he has discussed the relevant statutes as well as the applicable sentencing guidelines with his attorney.

## DISMISSAL OF REMAINING COUNTS

8.     The government agrees to move to dismiss the remaining counts of the indictment at the time of sentencing.

## ELEMENTS

9.     The parties understand and agree that in order to sustain the charge of Wire Fraud as set forth in count one, the government must prove each of the following propositions beyond a reasonable doubt:

>    First, that the defendant knowingly devised or participated in a scheme to defraud or to obtain money or property by materially false or fraudulent pretenses, representations, or promises;

>    Second, the scheme involved a materially false or fraudulent pretense, representation, or promise;

>    Third, that the defendant did so with the intent to defraud; and

>    Fourth, that for the purpose of carrying out the scheme or attempting to do so, the defendant caused interstate wire communications to take place, in the manner charged in the particular count.

## SENTENCING PROVISIONS

10.     The parties agree to waive the time limits in Fed. R. Crim. P. 32 relating to the presentence report, including that the presentence report be disclosed not less than 35 days before the sentencing hearing, in favor of a schedule for disclosure, and the filing of any objections, to be established by the court at the change of plea hearing.

11.     The parties acknowledge, understand, and agree that any sentence imposed by the court will be pursuant to the Sentencing Reform Act, and that the court will give due regard to the Sentencing Guidelines when sentencing the defendant.

12.     The parties acknowledge and understand that prior to sentencing, the United States Probation Office will conduct its own investigation of the defendant's criminal history. The parties further acknowledge and understand that, at the time the defendant enters a guilty plea, the parties may not have full and complete information regarding the defendant's criminal history. The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentencing court's determination of the defendant's criminal history.

## Sentencing Guidelines Calculations

13.     The defendant acknowledges and understands that the sentencing guidelines recommendations contained in this agreement do not create any right to be sentenced within any particular sentence range, and that the court may impose a reasonable sentence above or below the guideline range. The parties further understand and agree that if the defendant has provided false, incomplete, or inaccurate information that affects the calculations, the government is not bound to make the recommendations contained in this agreement.

## Relevant Conduct

14.     The parties acknowledge, understand, and agree that pursuant to Sentencing Guidelines Manual § 1B1.3, the sentencing judge may consider relevant conduct in calculating the sentencing guidelines range, even if the relevant conduct is not the subject of the offense to which the defendant is pleading guilty.

## Base Offense Level

15.     The parties agree to recommend to the sentencing court that the applicable base offense level for the offense charged in count one is 7 under Sentencing Guidelines Manual § 2B1.1(a)(1).

## Specific Offense Characteristics

16.     The parties agree to recommend to the sentencing court that an 18-level increase

for a loss amount of over $3,500,000 but not more than $9,500,000 under Sentencing Guidelines

Manual § 2B1.1(b)(1)(J) is applicable to the offense level for the offense charged in count one.

17.     The parties agree to recommend to the sentencing court that a 2-level increase for

over 10 victims under Sentencing Guidelines Manual § 2B1.1(b)(2)(A) is applicable to the

offense level for the offense charged in count one.

18.     The parties understand that the United States will recommend to the sentencing

court that a 2-level increase for use of sophisticated means under Sentencing Guidelines Manual

§ 2B1.1(b)(10)(C) is applicable to the offense level for the offense charged in count one. The

parties agree that the defendant reserves the right to argue against this enhancement.

## Role in the Offense

19.     Pursuant to Sentencing Guidelines Manual § 3B1.1, the parties understand that

the United States will recommend to the sentencing court that a 4-level increase be given for an

aggravating role in the offense. The parties agree that the defendant reserves the right to argue

against this enhancement entirely or for a 2-level or 3-level increase for a less aggravating role.

## Acceptance of Responsibility

20.     The government agrees to recommend a two-level decrease for acceptance of

responsibility as authorized by Sentencing Guidelines Manual § 3E1.1(a), but only if the

defendant exhibits conduct consistent with the acceptance of responsibility. In addition, if the

court determines at the time of sentencing that the defendant is entitled to the two-level reduction

under § 3E1.1(a), the government agrees to make a motion recommending an additional one-

level decrease as authorized by Sentencing Guidelines Manual § 3E1.1(b) because the defendant

timely notified authorities of his intention to enter a plea of guilty.

17

### Sentencing Recommendations

21.     Both parties reserve the right to provide the district court and the probation office with any and all information which might be pertinent to the sentencing process, including but not limited to any and all conduct related to the offense as well as any and all matters which might constitute aggravating or mitigating sentencing factors.

22.     Both parties reserve the right to make any recommendation regarding any other matters not specifically addressed by this agreement.

23.     The government agrees to recommend a sentence of no longer than 90 months of incarceration, to be served concurrently with the sentence the defendant is serving for Case No. 16-CR-64, and a term of supervised release. The parties understand that the defendant is not required to join the government in making its recommendation, and that the defendant will be free to recommend that any different sentence be imposed.

### Court's Determinations at Sentencing

24.     The parties acknowledge, understand, and agree that neither the sentencing court nor the United States Probation Office is a party to or bound by this agreement. The United States Probation Office will make its own recommendations to the sentencing court. The sentencing court will make its own determinations regarding any and all issues relating to the imposition of sentence and may impose any sentence authorized by law up to the maximum penalties set forth in paragraph 6 above. The parties further understand that the sentencing court will be guided by the sentencing guidelines but will not be bound by the sentencing guidelines and may impose a reasonable sentence above or below the calculated guideline range.

25.     The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentence imposed by the court.

## FINANCIAL MATTERS

26.     The defendant acknowledges and understands that any and all financial obligations imposed by the sentencing court are due and payable in full upon entry of the judgment of conviction. The defendant further understands that any payment schedule imposed by the sentencing court shall be the minimum the defendant is expected to pay and that the government's collection of any and all court imposed financial obligations is not limited to the payment schedule. The defendant agrees not to request any delay or stay in payment of any and all financial obligations. If the defendant is incarcerated, the defendant agrees to participate in the Bureau of Prisons' Inmate Financial Responsibility Program, regardless of whether the court specifically directs participation or imposes a schedule of payments.

27.     The defendant agrees to provide to the Financial Litigation Unit (FLU) of the United States Attorney's Office, at least 30 days before sentencing, and also upon request of the FLU during any period of probation or supervised release imposed by the court, a complete and sworn financial statement on a form provided by FLU and any documentation required by the form. The defendant further agrees, upon request of FLU whether made before or after sentencing, to promptly: cooperate in the identification of assets in which the defendant has an interest, cooperate in the liquidation of any such assets, and participate in an asset deposition.

### Special Assessment

28.     The defendant agrees to pay the special assessment in the amount of $100 prior to or at the time of sentencing.

### Restitution

29.     The defendant agrees to pay restitution in the amount of at least $9,389,440 to the victims and in the amounts listed in Attachment A, except that the amount owed to each victim will be offset by any money the victim recovers from the defendant, companies associated with

19

the defendant, or their successor entities. Such offset should include but is not limited to any recovery a victim has from the sale or transfer of any stock, unit shares, or other interest a victim has in connection with the defendant, companies associated with the defendant, or their successor entities. The defendant agrees that additional victims to whom restitution is owed may be determined at the time of sentencing. The defendant understands that because restitution for the offense is mandatory, the amount of restitution shall be imposed by the court regardless of the defendant's financial resources. The defendant agrees to cooperate in efforts to collect the restitution obligation. The defendant understands that imposition or payment of restitution will not restrict or preclude the filing of any civil suit or administrative action.

### DEFENDANT'S WAIVER OF RIGHTS

30.     In entering this agreement, the defendant acknowledges and understands that he surrenders any claims he may have raised in any pretrial motion, as well as certain rights which include the following:

   a.     If the defendant persisted in a plea of not guilty to the charges against him, he would be entitled to a speedy and public trial by a court or jury. The defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, the defendant, the government and the judge all must agree that the trial be conducted by the judge without a jury.

   b.     If the trial is a jury trial, the jury would be composed of twelve citizens selected at random. The defendant and his attorney would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising peremptory challenges. The jury would have to agree unanimously before it could return a verdict of guilty. The court would instruct the jury that the defendant is presumed innocent until such time, if ever, as the government establishes guilt by competent evidence to the satisfaction of the jury beyond a reasonable doubt.

   c.     If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all of the evidence, whether or not he was persuaded of defendant's guilt beyond a reasonable doubt.

d. At such trial, whether by a judge or a jury, the government would be required to present witnesses and other evidence against the defendant. The defendant would be able to confront witnesses upon whose testimony the government is relying to obtain a conviction and he would have the right to cross-examine those witnesses. In turn the defendant could, but is not obligated to, present witnesses and other evidence on his own behalf. The defendant would be entitled to compulsory process to call witnesses.

e. At such trial, defendant would have a privilege against self-incrimination so that he could decline to testify and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify on his own behalf.

31. The defendant acknowledges and understands that by pleading guilty he is waiving all the rights set forth above. The defendant further acknowledges the fact that his attorney has explained these rights to him and the consequences of his waiver of these rights. The defendant further acknowledges that as a part of the guilty plea hearing, the court may question the defendant under oath, on the record, and in the presence of counsel about the offense to which the defendant intends to plead guilty. The defendant further understands that the defendant's answers may later be used against the defendant in a prosecution for perjury or false statement.

32. The defendant acknowledges and understands that he will be adjudicated guilty of the offense to which he will plead guilty and thereby may be deprived of certain rights, including but not limited to the right to vote, to hold public office, to serve on a jury, to possess firearms, and to be employed by a federally insured financial institution.

33. The defendant knowingly and voluntarily waives all claims he may have based upon the statute of limitations, the Speedy Trial Act, and the speedy trial provisions of the Sixth Amendment. The defendant agrees that any delay between the filing of this agreement and the entry of the defendant's guilty plea pursuant to this agreement constitutes excludable time under the Speedy Trial Act.

21

34. Based on the government's concessions in this agreement, the defendant knowingly and voluntarily waives his right to appeal his sentence in this case and further waives his right to challenge his conviction or sentence in any post-conviction proceeding, including but not limited to a motion pursuant to 28 U.S.C. § 2255. As used in this paragraph, the term "sentence" means any term of imprisonment, term of supervised release, term of probation, supervised release condition, fine, forfeiture order, and restitution order. The defendant's waiver of appeal and post-conviction challenges includes the waiver of any claim that (1) the statutes or Sentencing Guidelines under which the defendant is convicted or sentenced are unconstitutional, and (2) the conduct to which the defendant has admitted does not fall within the scope of the statutes or Sentencing Guidelines. This waiver does not extend to an appeal or post-conviction motion based on (1) any punishment in excess of the statutory maximum, (2) the sentencing court's reliance on any constitutionally impermissible factor, such as race, religion, or sex, (3) ineffective assistance of counsel in connection with the negotiation of the plea agreement or sentencing, or (4) a claim that the plea agreement was entered involuntarily.

35. The defendant knowingly and voluntarily waives any claim or objection he may have based on statute of limitations and venue.

### Further Civil or Administrative Action

36. The defendant acknowledges, understands, and agrees that the defendant has discussed with his attorney and understands that nothing contained in this agreement, including any attachment, is meant to limit the rights and authority of the United States of America or any other state or local government to take further civil, administrative, or regulatory action against the defendant, including but not limited to any listing and debarment proceedings to restrict rights and opportunities of the defendant to contract with or receive assistance, loans, and benefits from United States government agencies.

## GENERAL MATTERS

37.     The parties acknowledge, understand, and agree that this agreement does not require the government to take, or not to take, any particular position in any post-conviction motion or appeal.

38.     The parties acknowledge, understand, and agree that this plea agreement will be filed and become part of the public record in this case. The parties acknowledge, understand, and agree that the United States Attorney's office is free to notify any local, state, or federal agency of the defendant's conviction.

39.     The defendant understands that pursuant to the Victim and Witness Protection Act, the Justice for All Act, and regulations promulgated thereto by the Attorney General of the United States, the victim of a crime may make a statement describing the impact of the offense on the victim and further may make a recommendation regarding the sentence to be imposed. The defendant acknowledges and understands that comments and recommendations by a victim may be different from those of the parties to this agreement.

### Further Action by Internal Revenue Service

40.     Nothing in this agreement shall be construed so as to limit the Internal Revenue Service in discharging its responsibilities in connection with the collection of any additional tax, interest, and penalties due from the defendant as a result of the defendant's conduct giving rise to the charges alleged in the indictment.

### EFFECT OF DEFENDANT'S BREACH OF PLEA AGREEMENT

41.     The defendant acknowledges and understands if he violates any term of this agreement at any time, engages in any further criminal activity prior to sentencing, or fails to appear for sentencing, this agreement shall become null and void at the discretion of the government. The defendant further acknowledges and understands that the government's

agreement to dismiss any charge is conditional upon final resolution of this matter. If this plea agreement is revoked or if the defendant's conviction ultimately is overturned, then the government retains the right to reinstate any and all dismissed charges and to file any and all charges which were not filed because of this agreement. The defendant hereby knowingly and voluntarily waives any defense based on the applicable statute of limitations for any charges filed against the defendant as a result of his breach of this agreement. The defendant understands, however, that the government may elect to proceed with the guilty plea and sentencing. If the defendant and his attorney have signed a proffer letter in connection with this case, then the defendant further acknowledges and understands that he continues to be subject to the terms of the proffer letter.

## VOLUNTARINESS OF DEFENDANT'S PLEA

42.     The defendant acknowledges, understands, and agrees that he will plead guilty freely and voluntarily because he is in fact guilty. The defendant further acknowledges and agrees that no threats, promises, representations, or other inducements have been made, nor agreements reached, other than those set forth in this agreement, to induce the defendant to plead guilty.

## ACKNOWLEDGMENTS

I am the defendant. I am entering into this plea agreement freely and voluntarily. I am not now on or under the influence of any drug, medication, alcohol, or other intoxicant or depressant, whether or not prescribed by a physician, which would impair my ability to understand the terms and conditions of this agreement. My attorney has reviewed every part of this agreement with me and has advised me of the implications of the sentencing guidelines. I have discussed all aspects of this case with my attorney and I am satisfied that my attorney has provided effective assistance of counsel.

Date: _10 - 8 - 2018_      _____
RONALD H. VAN DEN HEUVEL
Defendant

I am the defendant's attorney. I carefully have reviewed every part of this agreement with the defendant. To my knowledge, my client's decision to enter into this agreement is an informed and voluntary one.

Date: _10/8/18_      _____
ROBERT G. LEBELL
Attorney for Defendant

For the United States of America:

Date: _____      _____
MATTHEW D. KRUEGER
United States Attorney

Date: _____      _____
ADAM H. PTASHKIN
Assistant United States Attorney

Date: _____      _____
BELINDA I. MATHIE
Special Assistant United States Attorney

## ACKNOWLEDGMENTS

I am the defendant. I am entering into this plea agreement freely and voluntarily. I am not now on or under the influence of any drug, medication, alcohol, or other intoxicant or depressant, whether or not prescribed by a physician, which would impair my ability to understand the terms and conditions of this agreement. My attorney has reviewed every part of this agreement with me and has advised me of the implications of the sentencing guidelines. I have discussed all aspects of this case with my attorney and I am satisfied that my attorney has provided effective assistance of counsel.

Date: _____

RONALD H. VAN DEN HEUVEL
Defendant

I am the defendant's attorney. I carefully have reviewed every part of this agreement with the defendant. To my knowledge, my client's decision to enter into this agreement is an informed and voluntary one.

Date: _____

ROBERT G. LEBELL
Attorney for Defendant

For the United States of America:

Date: _10-8- 2018_

MATTHEW D. KRUEGER
United States Attorney

Date: _10|8|2018_

ADAM H. PTASHKIN
Assistant United States Attorney

Date: _10/8/2018_

BELINDA I. MATHIE
Special Assistant United States Attorney

# ATTACHMENT A

Beginning in early 2011 and continuing through at least August 2015, Ronald H. Van Den Heuvel ("defendant" or "Van Den Heuvel") knowingly devised and participated in a scheme to defraud lenders and investors, and to obtain money from them, by making materially false representations and promises about his "Green Box" business plan.

## A.    Scheme to Defraud

Van Den Heuvel was a businessman in De Pere, Wisconsin.  In early 2011, Van Den Heuvel began promoting his "Green Box" business plan to obtain funds from lenders and investors.  As represented by Van Den Heuvel, the Green Box business plan was to purchase the equipment and facilities necessary to employ proprietary processes that could convert food-contaminated, post-consumer solid waste into consumer products and energy, without any wastewater discharge or landfilling of byproducts.

Van Den Heuvel formed and controlled numerous business entities, including the following:

- Environmental Advanced Reclamation Technology HQ, LLC ("EARTH") was formed as a Wisconsin limited liability corporation that Van Den Heuvel represented as the holding company for his other entities.

- Green Box NA, LLC ("Green Box NA") was a Wisconsin limited liability corporation that Van Den Heuvel formed and controlled.

- Green Box NA Green Bay, LLC ("Green Box-Green Bay") was a Wisconsin limited liability corporation that Van Den Heuvel formed and represented as pursuing the Green Box business plan in De Pere, Wisconsin.

- Green Box NA Detroit, LLC ("Green Box-Detroit") was a Michigan limited liability corporation that Van Den Heuvel formed and represented as pursuing a Green Box operation in Michigan.

Van Den Heuvel obtained funds from a range of lenders and investors by making materially false representations and promises, including that he would use, and had used, the funds to advance the Green Box operations.  In many instances, Van Den Heuvel entered into agreements with lenders and investors that dictated specific uses for the funds, such as the purchase of particular equipment.  Soon after receiving funds from lenders or investors, Van Den Heuvel diverted significant amounts to purposes that did not advance the Green Box business plan or the specific uses dictated in funding agreements.  Van Den Heuvel also took steps to conceal how he had misused lenders' and investors' funds.

Records from financial institutions show that, during the relevant time, Van Den Heuvel caused numerous bank accounts to be opened or maintained at multiple banks.  Account opening documents and witness statements show that Van Den Heuvel exercised control over the bank accounts.  Van Den Heuvel opened the bank accounts in the names of his companies, not in his personal name.  In general, the bank accounts had low balances when lenders' or investors' funds were received.  Van Den Heuvel frequently transferred the lenders' and investors' funds to various bank accounts from which he expended the funds in a relatively short period.

1

### 1.   M.A.

In April 2011, Van Den Heuvel persuaded an acquaintance in the Green Bay area, M.A., to invest $600,000 in Green Box-Green Bay pursuant to an Agreement to Issue Stock and Provide Collateral ("the Agreement"). The Agreement does not specify particular uses for the funds, but M.A. states that he relied on oral assurances from Van Den Heuvel that the funds would be used to further the Green Box business plan in Green Bay. Under the Agreement, M.A. received 600,000 "membership units" in Green Box-Green Bay, a guaranteed annual return of 10% to be paid in quarterly installments, and certain security interests.

Van Den Heuvel's bank accounts had low balances in April 2011 when he received M.A.'s funds. Within a few weeks, Van Den Heuvel had spent the majority of the funds on purposes unrelated to Green Box-Green Bay business plan. For example, bank records show that Van Den Heuvel used the funds to pay $19,184 for Packers tickets in club seats; $100,000 towards a settlement in an old legal dispute; $57,777 in court-ordered support payments to his ex-wife; and $6,409 towards the mortgage on a home in Florida. Van Den Heuvel also withdrew approximately $24,000 in cash.

Van Den Heuvel failed to make the quarterly interest payments required by his agreement with M.A. Throughout 2011, Van Den Heuvel assured M.A. that Green Box-Green Bay was on track. Van Den Heuvel directed M.A. to keep certain days free for a "grand opening" ceremony. Eventually, M.A. demanded a refund of his investment. In subsequent conversations and emails, Van Den Heuvel told M.A. that he would refund M.A.'s investment as soon as he received significant funding that he promised was imminent. These emails were interstate wire communications because they traversed a Microsoft Corp. server outside Wisconsin. Van Den Heuvel's promises deterred M.A. from filing suit until early 2013.

### 2.   Cliffton Equities

Cliffton Equities is a private investment firm located in Montreal, Canada. In September 2012, Van Den Heuvel persuaded Cliffton Equities to invest $2 million in Green Box-Green Bay. Specifically, on or about September 21, 2012, Van Den Heuvel caused Cliffton Equities to transfer $1,000,000 via a wire transfer from Toronto, Canada, through JPMorgan Chase Bank in New York, New York, to U.S. Bank account no. -9590 in Manitowoc, Wisconsin. Van Den Heuvel caused Cliffton Equities to transfer an additional $1,000,000 in the same manner on or about September 28, 2012. Cliffton's $2 million investment was documented by two promissory notes in the amount of $1 million each, with an annual interest rate of 8%. The promissory notes matured at the earlier of: (1) one year, or (2) the receipt by EARTH or one of its affiliates of at least $40 million in new financing.

To induce the investment, on or about September 21, 2012, Van Den Heuvel caused Green Box-Green Bay and EARTH to enter into a Loan and Investment Agreement (the "Agreement") with Cliffton Equities. In the Agreement and in discussions leading to the Agreement, Van Den Heuvel represented that Green Box would use the funds "solely for the purposes of purchasing and installing the sorting and liquefaction Equipment . . . at Green Box's facility" and for "working capital to operate sorting, liquefaction and pulping equipment." Van Den Heuvel further represented to Cliffton Equities that its funds would be used to purchase a liquefaction unit from RGEN Systems, and that the unit would be suitable for the Green Box-Green Bay business

plan, allowing it quickly to begin full-time sorting, liquefaction, and pulping operations at a facility in De Pere. Van Den Heuvel also provided Cliffton Equities with financial statements that falsely overstated his companies' value.

After receiving Cliffton Equities' funds, bank records show that Van Den Heuvel paid RGEN Systems $350,000 as an initial payment for a prototype of its liquefaction unit. Representatives of RGEN Systems state that this payment caused them to move the prototype from Dallas, Texas, to Green Box-Green Bay in anticipation of receiving the balance of the purchase price, which was necessary to install the prototype and develop a larger capacity unit suitable for full-time operations. Bank records and RGEN representatives confirm that Van Den Heuvel never paid RGEN Systems the balance of the purchase price for the prototype, and that a larger-capacity unit was never constructed.

Instead, bank records show that Van Den Heuvel diverted most of Cliffton Equities' funds to impermissible purposes. For example, soon after receiving Cliffton Equities' funds, Van Den Heuvel used the funds to pay the following amounts:

- $40,538 in court-ordered support payments to his ex-wife;
- $25,000 to his friend, E.L., to reimburse him for Packers tickets;
- $33,000 for his wife's dental work;
- $89,000 for a new Cadillac Escalade;
- $16,570 to Wisconsin International School for his children's tuition;
- $52,235 in property taxes for his residence; and
- $50,000 towards a legal settlement in an old business dispute.

Cliffton Equities' representatives state that they would not have wired the $2 million to the defendant if not for the defendant's false representations and assurances that the funds would be used according to the Agreement.

Van Den Heuvel concealed his misuse of Cliffton Equities' funds by falsely representing to Cliffton Equities that its funds were being used to purchase and install the needed equipment. For example, in a December 2012 email, Van Den Heuvel assured Cliffton Equities that the RGEN unit was proceeding "on their funding" and would be "operational" in four weeks. Later in 2013, Van Den Heuvel told Cliffton Equities that the RGEN liquefaction unit could not become operational because of safety issues with its design.

On or about June 19, 2014, Van Den Heuvel persuaded Cliffton Equities to enter into an amended Loan and Investment Agreement ("2014 Agreement") to invest additional funds to purchase two liquefaction units from a different manufacturer, Kool Manufacturing Company (hereinafter "Kool Units"). The 2014 Agreement with Cliffton Equities stated that Green Box-Green Bay would use the additional loan proceeds solely for the purposes of "purchasing and installing" the two Kool Units and for "restarting the EcoFibre, Inc. facility and providing working capital funds for such facility's operation." The 2014 Agreement provided Cliffton Equities a security interest in two Kool Units (and other collateral). Cliffton Equities' representatives state that they would not have entered into the 2014 Agreement if they had known how Van Den Heuvel actually used their 2012 investment.

3

Pursuant to the 2014 Agreement, Cliffton Equities transferred $300,000 to Green Box-Green Bay on June 19, 2014. Emails show that in the fall of 2014, Van Den Heuvel requested additional payments from Cliffton Equities, representing that they were necessary to purchase and install the two Kool Units. Based upon Van Den Heuvel's representations, Cliffton Equities paid Green Box-Green Bay and Green Box NA four additional amounts totaling $849,940: (ii) $99,980 on or about August 29, 2014; (iii) $379,980 on or about November 6, 2014; (iv) $299,980 on or about November 13, 2014; and (v) $70,000 on or about December 2, 2014. Cliffton Equities' additional investments in 2014 were documented by an Amended and Restated Promissory Note with an interest rate of 12% per year and a term of 18 months.

Bank records show that Van Den Heuvel directed that approximately half of Cliffton Equities' additional funds be used to purchase and install one Kool Unit. Van Den Heuvel diverted large sums of Cliffton Equities' funds to be used for other purposes, including personal expenditures and business expenses unrelated to the Kool Units or restarting the EcoFibre facility. Around the same time, Van Den Heuvel used funds from other investors to purchase a second Kool Unit. Van Den Heuvel represented to Cliffton Equities, however, that its funds were used to purchase both units. In December 2014, Van Den Heuvel caused serial numbers for two specific Kool Units to be sent to Cliffton Equities. Subsequently, when Cliffton Equities became concerned about Van Den Heuvel's operations and declined to invest more funds, he claimed that Cliffton Equities had only funded one Kool Unit.

### 3. WEDC

Van Den Heuvel defrauded the Wisconsin Economic Development Council ("WEDC") with regard to a $1,116,000 loan and a $95,500 grant.

On or about March 8, 2011, Van Den Heuvel, through an employee, submitted a proposal to the Wisconsin Department of Commerce, the predecessor to the WEDC. The proposal and subsequent emailed submissions included false representations and inflated financial statements that portrayed Van Den Heuvel and his business entities as credit worthy. In the submissions, Van Den Heuvel represented that WEDC's funding would allow Green Box-Green Bay to start full-time operations and create 116 new jobs at the EcoFibre facility at on Fortune Avenue in De Pere.

On or about September 14, 2011, Van Den Heuvel executed a loan agreement on behalf of Green Box-Green Bay with the WEDC to obtain a loan of $1,116,000. The loan agreement provided that Green Box-Green Bay would use the WEDC funds to purchase and install equipment that would produce marketable pulp, fuel pellets, synthetic fuel, and tissue and cup products. The loan agreement further stated that, prior to the disbursement of any funds, Green Box-Green Bay had to deliver to the WEDC: (i) documentation that Green Box-Green had acquired the EcoFibre facility; (ii) a mortgage on the EcoFibre facility; (iii) documentation that Green Box-Green Bay would purchase all the equipment necessary to produce marketable pulp, baled and sorted waste paper, fuel pellets, and synthetic fuel; and (iv) documentation that VHC, Inc. (a company controlled by Van Den Heuvel's brothers) had made a capital contribution of $5,500,000 to the project.

On or about September 30, 2011, Van Den Heuvel submitted a draw request that caused the WEDC to disburse the full $1,116,000 of funds. In the draw request, Van Den Heuvel submitted documentation that gave the false impression that funds from Baylake Bank and VHC, Inc. had been used to allow Green Box-Green Bay to acquire the EcoFibre facility. Van Den Heuvel

executed a mortgage in the name of Green Box-Green Bay in favor of WEDC on the EcoFibre facility. In truth, Green Box-Green Bay had not acquired the EcoFibre facility. Instead, the facility underwent foreclosure and was obtained by VHC, Inc., leaving WEDC with no security interest in the facility. WEDC representatives state that it would not have authorized the loan or the disbursement of funds if WEDC was aware of the defendant's false statements.

Van Den Heuvel used WEDC funds to make some partial payments on some of the equipment identified in the draw request, but Van Den Heuvel diverted large portions of the funds to impermissible purposes. These included paying $35,000 in court-ordered payments to his ex-wife and $45,000 to settle a lawsuit filed by his former nanny. Van Den Heuvel also took out approximately $39,200 in cash.

In subsequent years, Van Den Heuvel concealed the misuse of WEDC's funds. Van Den Heuvel submitted annual reports that represented the project was on track. In addition, on or about March 31, 2014, and April 14, 2015, Van Den Heuvel submitted Schedules of Expenditures to the WEDC in which he falsely certified that Green Box-Green Bay had expended all loan funds in accordance with the loan agreement's terms. These certifications were submitted by email, which were interstate wire communications because the emails traversed a Microsoft Corp. server outside Wisconsin.

On or about January 4, 2012, the WEDC also awarded Green Box-Green Bay a grant of up to $95,500 to reimburse the costs of training employees from 2012 to 2014 in waste sorting, fuel pellet production, and liquefaction manufacturing jobs that its loan was to help create. To obtain the reimbursements, Green Box-Green Bay had to submit documentation showing that particular individuals were trained on those particular jobs on particular dates.

Green Box-Green Bay did not actually incur eligible training costs. Nonetheless, Van Den Heuvel directed two employees, T.P. and P.R., to create fraudulent records showing that the training had occurred. At Van Den Heuvel's direction, P.R. emailed the draw requests to the WEDC on or about December 7, 2013, March 5, 2014, and November 20, 2014. These false records caused the WEDC to pay the full grant amount of $95,500.

### 4.    D.W.

In September 2012 and December 2012, Van Den Heuvel persuaded a personal acquaintance, D.W., to invest a total of $40,000 in Green Box-Green Bay in exchange for 200,000 membership units and a promise of repayment. D.W. produced his investment agreement as corroboration. According D.W., Van Den Heuvel orally assured him that the funds would be used for patent and legal fees. Bank records show that Van Den Heuvel instead immediately converted D.W.'s funds to cash and never repaid him.

### 5.    EB-5 Investors

Van Den Heuvel obtained funds from Chinese investors through the EB-5 program as part of the scheme. The EB-5 program provides a route for immigrant investors to become lawful permanent residents by investing at least $500,000 in a project sponsored by a government-approved regional center. The program requires that the entire $500,000 investment be expended on job-creating activities.

Van Den Heuvel obtained the Chinese investors' funds through agreements he made with S.A., a Georgia attorney. S.A. controlled the government-approved Green Detroit Regional Center, LLC, which sponsors individual projects that direct EB-5 investments to environmentally friendly, job-creating entities in Michigan. Van Den Heuvel persuaded GDRC to create an entity called SMS Investment Group VI ("SMS 6") to collect and transfer EB-5 investments to Green Box-Detroit. As part of the agreement, Van Den Heuvel represented to Green Detroit Regional Center and SMS 6 that he would use the EB-5 investment funds solely to pursue the Green Box-Detroit project.

Van Den Heuvel provided information regarding the Green Box-Detroit project to S.A. to use in promoting the project and seeking EB-5 investors. In this information, Van Den Heuvel provided material misrepresentations, knowing that they would be used to induce investments, including (i) that the funds would be used for the Green Box-Detroit project; (ii) that EARTH and Green Box-Detroit had agreements with Cargill, Inc. even though Cargill, Inc. had terminated the agreements; (iii) that the Michigan Economic Development Corporation (MEDC) had approved Green Box-Michigan for a tax-exempt bond offering even after MEDC notified that it had discovered numerous liens and judgments against Van Den Heuvel's companies, which would preclude any bond offering; and (iv) that Green Box-Detroit had acquired certain equipment with investors' funds that had not been acquired.

Nine EB-5 investors from China invested approximately $4,475,000 in SMS 6 from September 2014 through August 2015. Each EB-5 investor received 1,000 membership units in SMS 6 in exchange for his or her investment. Pursuant to its agreement with Van Den Heuvel, SMS 6 wired those funds to Green Box-Detroit. SMS 6's investments in Green Box-Detroit were documented by promissory notes with five-year term and, typically, an interest rate of 4% per year. Bank records show that Van Den Heuvel diverted large amounts of the EB-5 investments to purposes other than the Green Box-Detroit business plan, including repaying old debt to investors in Van Den Heuvel-affiliated companies other than Green Box-Detroit, court-ordered support for Van Den Heuvel's ex-wife, and other personal expenses.

### B. The Green Box Process and Technology

Nothing in the instant statement of facts should be construed as, nor is it a concession or admission regarding the viability of the Green Box Process and Technology. The defendant maintains that both the technology and process which support the Green Box plan were valid and sound.

### C.     Losses to Lenders and Investors

Following are amounts the defendant fraudulently obtained from the listed victims through the scheme, less amounts any victim recovered through other means.  This is not a comprehensive list; there may be other victims who lost funds through the scheme.  The amount of restitution owed to each victim will be offset by any money the victim recovers from the defendant, companies associated with the defendant, or their successor entities. Such offset should include but is not limited to any recovery a victim has from the sale or transfer of any stock, unit shares, or other interest a victim has in connection with the defendant, companies associated with the defendant, or their successor entities.

| Victim | Loss Amount |
|---|---|
| Wisconsin Economic Development Council | $1,211,500 |
| Cliffton Equities | $3,149,940 |
| M.A. | $600,000 - $112,000 garnishment recovery |
| EB-5 Investors | $4,475,000 |
| E.L. | $25,000 |
| D.W. | $40,000 |
| **Total** | **$9,389,440** |